IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0005
════════════
 
Transcontinental Insurance 
Company, Petitioner,
 
v.
 
Joyce Crump, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued January 20, 
2010
 
 
            
Justice Green delivered the 
opinion of the Court, in which Chief 
Justice Jefferson, Justice 
Hecht, Justice Wainwright, 
Justice Medina, and Justice Willett joined, and in which 
Justice Johnson and Justice Lehrmann joined as to Parts I, 
II, IV and V.
 
            
Justice Johnson filed a 
concurring opinion, in which Justice 
Lehrmann joined.
 
            
Justice Guzman did not 
participate in the decision.
 
 
            
In this workers’ compensation case, we decide three issues: (1) whether 
expert medical causation testimony from a treating physician relying on a 
differential diagnosis is reliable and, therefore, legally sufficient evidence 
to support the jury’s verdict; (2) whether the trial court erred in submitting a 
jury charge that defined “producing cause” without including a but-for component; and (3) whether an insurance carrier that 
is unsuccessful on judicial review is entitled to a jury trial on the disputed 
amount of a claimant’s attorney’s fees under Texas Labor Code § 408.221(c). We 
hold that: (1) the treating physician’s opinion was based on a reliable 
foundation and, therefore, legally sufficient evidence supports the jury’s 
verdict; (2) the trial court’s omission of the but-for component in the jury 
charge constitutes reversible error; and (3) an insurance carrier is entitled to 
have a jury determine the disputed amount of reasonable and necessary attorney’s 
fees for which it is liable. Accordingly, we reverse the court of appeals’ 
judgment and remand the case to the trial court for new trial.
I. Background
            
Charles Crump received a kidney transplant in 1975 and began a lifelong 
regimen of immunosuppressant drug therapy to ensure his body would not reject 
the new kidney. Crump began working for Frito-Lay in the mid-1980s. In May 2000, 
while training another employee in the packaging department, Crump struck his 
right knee on a piece of machinery. The injury caused a contusion (bruise) and a 
hematoma (a collection of blood) at the wound site. He applied for and received 
workers’ compensation benefits for the work-related injury. After a series of 
increasingly serious health complications which required repeated, lengthy 
hospitalizations, Crump died in January 2001 at age forty-three. His wife, Joyce 
Crump,[1] applied for workers’ compensation death 
benefits, alleging that the May 2000 injury was a producing cause of her 
husband’s death. A contested case hearing officer found that the May 2000 injury 
resulted in Crump’s death and awarded death benefits. In 2002, the workers’ 
compensation appeals panel affirmed the hearing officer’s benefits award.
            
Frito-Lay’s workers’ compensation carrier, Transcontinental Insurance 
Company, sought judicial review of the administrative award of death benefits. 
See Tex. Lab. Code §§ 410.301–.308 (providing for, and limiting 
scope of, judicial review of a death benefits award). As 
the party appealing the administrative decision, Transcontinental bore the 
burden of proving its only disputed issue—that the May 2000 injury was not a 
producing cause of Crump’s death—by a preponderance of the evidence. See 
id. § 410.303. At trial, Transcontinental offered the testimony of Dr. 
Judson Hunt. Hunt reviewed Crump’s medical records and testified that the May 
2000 injury was not a producing cause of Crump’s death, and that his death would 
have occurred without the work-related injury. To rebut Hunt’s opinion, Crump 
offered Dr. John Daller, one of Crump’s treating 
physicians, who testified that the May 2000 injury was a producing cause of 
Crump’s death. The trial court overruled Transcontinental’s objections that 
Daller’s testimony was not based on a reliable 
foundation and allowed him to testify. After hearing the evidence, the jury 
answered in the affirmative the single question put before it, “Was Charles 
Crump’s May 9, 2000 injury a producing cause of his death?” Crump submitted the 
issue of attorney’s fees to the trial court. See id. § 408.221(c) (mandating payment 
of a claimant’s attorney’s fees by an insurance carrier that unsuccessfully 
seeks judicial review). Transcontinental had objected that those fees should 
also be submitted to the jury, rather than the trial court. The trial court 
disagreed with Transcontinental and awarded Crump attorney’s fees, as well as 
fees for time spent pursuing those fees.
            
Transcontinental appealed. The court of appeals grouped 
Transcontinental’s issues into three categories: (1) the trial court’s 
acceptance of the reliability of Crump’s expert’s testimony on causation, as 
well as the legal and factual sufficiency of that testimony to support the 
verdict; (2) the trial court’s definition of producing cause in the jury charge; 
and (3) the determination of Crump’s attorney’s fees by the trial court rather 
than by the jury, as well as the amount of fees awarded. 274 
S.W.3d 86, 96 (Tex. App.—Houston [14th Dist.] 2008). Finding no error in 
any category, the court of appeals affirmed the trial court’s judgment. Id. at 90.
            
We granted Transcontinental’s petition for review. 53 
Tex. Sup. Ct. J. 15 (Oct. 23, 2009). Finding the court of appeals’ 
categorization of the issues useful, we address each in turn.
II. Legal Sufficiency of Expert Testimony
            
Producing cause was the only issue submitted to the jury at trial. 
Because this is an appeal of a Workers’ Compensation Commission award of death 
benefits, Transcontinental acknowledges that it had the burden to prove that the 
May 2000 injury was not a producing cause of Crump’s death. See 
Tex. Lab. 
Code § 410.303 (“The party appealing the decision [of the appeals 
panel] on an issue [regarding compensability or eligibility for or the amount of 
income or death benefits] has the burden of proof by a preponderance of the 
evidence.”); Morales v. Liberty Mut. Ins. Co., 
241 S.W.3d 514, 516–17 (Tex. 2007) (discussing the avenues of judicial review). 
Thus, Transcontinental, the insurance carrier, was the plaintiff at trial; 
Crump, the claimant, was the defendant.
            
The trial court asked the jury whether Crump’s injury was a 
producing cause of his death, but to properly allocate the burden of proof, the 
court instructed the jury to answer “yes” unless they found by a preponderance 
of the evidence that the answer should be “no.” In answering “yes,” the jury 
thus failed to find that Crump’s injury did not cause his death. On appeal, 
Transcontinental asserts that it conclusively established the lack of causality 
and is therefore entitled to judgment in its favor as a matter of law.
            
At trial, Transcontinental’s expert, Hunt, testified that the natural 
complications of being immunosuppressed for 
twenty-five years had caused Crump’s death—not the May 2000 injury. Crump’s 
expert and treating physician, Daller, testified that 
the wound site of the May 2000 work-related injury became infected, the 
infection caused Crump’s already-weakened organs to fail, and his organ failure 
in turn caused his death. Transcontinental objected to the admission of Daller’s testimony on the ground that it was unreliable, but 
the trial court overruled that objection. Here, Transcontinental reasserts that 
Daller’s testimony was unreliable and therefore 
legally insufficient evidence of causation. Without Daller’s testimony, Transcontinental argues, Hunt’s 
testimony establishes the lack of causation. Accordingly, we must decide whether 
Daller’s testimony was reliable and, if so, whether it 
was some evidence of causation.
            
“An expert witness may testify regarding ‘scientific, technical, or other 
specialized’ matters if the expert is qualified and if the expert’s opinion is 
relevant and based on a reliable foundation.” Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 578 (Tex. 2006) (citing Tex. R. Evid. 702). In determining 
whether expert testimony is reliable, a court should consider the factors we set 
out in E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 
(Tex. 1995),[2] as well as the expert’s experience, 
knowledge, and training. See Gammill v. Jack 
Williams Chevrolet, Inc., 972 S.W.2d 713, 726–27 (Tex. 1998) (deeming expert 
testimony based on the latter considerations unreliable when “there is simply 
too great an analytical gap between the data and the opinion proffered” (citing 
Gen. Elec. Co. v. Joiner, 552 U.S. 136, 146 (1997)); see also 
Tex. R. Evid. 702 (providing for witnesses qualified as experts “by knowledge, 
skill, experience, training, or education”).
 
[I]n very 
few cases will the evidence be such that the trial court’s reliability 
determination can properly be based only on the experience of a qualified expert 
to the exclusion of factors such as those set out in Robinson, or, on the 
other hand, properly be based only on factors such as those set out in 
Robinson to the exclusion of considerations based on a qualified expert’s 
experience.
 
Whirlpool 
Corp. v. Camacho, 298 S.W.3d 631, 638 (Tex. 2009); see also Mack 
Trucks, 206 S.W.3d at 579 (“[T]he criteria for assessing reliability must 
vary depending on the nature of the evidence.”).
            
Here, we are considering the reliability of a treating physician’s 
opinion based on a particular diagnostic methodology—differential diagnosis. 
This is a routine diagnostic method used in internal medicine whereby a treating 
physician formulates a hypothesis as to likely causes of a patient’s presented 
symptoms and eliminates unlikely causes by a deductive process of elimination. 
See, e.g., Coastal Tankships, U.S.A., Inc. 
v. Anderson, 87 S.W.3d 591, 604–05 & n.24 (Tex. App.—Houston [1st Dist.] 
2002, pet. denied) (en banc) (“[Differential diagnosis] is a clinical process 
whereby a doctor determines which of several potential diseases or injuries is 
causing the patient’s symptoms by ruling out possible causes—by comparing the 
patient’s symptoms to symptoms associated with known diseases, conducting 
physical examinations, collecting data on the patient’s history and illness, and 
analyzing that data—until a final diagnosis for proper treatment is reached.”). 
If the physician’s treatment of the suspected cause alleviates the patient’s 
symptoms, the disease or condition treated can be said to have been the internal 
cause of the eliminated symptoms. See id. If the patient’s symptoms 
remain after treatment of the suspected disease or condition, the physician 
rules out the suspected disease or condition as the internal cause of the 
patient’s symptoms and formulates a new hypothesis as to the possible culprit. 
See id.
            
Crump asserts that because differential diagnosis is a reliable medical 
technique, the application of the Robinson factors is tempered, or less 
strict, when a treating physician using that technique is involved. This is the 
approach adopted by the court of appeals below, which refused to apply 
Robinson at all. See 274 S.W.3d at 96–97. 
We have held the opposite to be true: “[T]he relevance and reliability 
requirements of Rule 702 [apply] to all expert evidence offered under that rule, 
even though the criteria for assessing relevance and reliability must vary, 
depending on the nature of the evidence.” Gammill, 972 S.W.2d at 727; see also Camacho, 
298 S.W.3d at 638. The mere fact that differential diagnosis was used does not 
exempt the foundation of a treating physician’s expert opinion from scrutiny—it 
is to be evaluated for reliability as carefully as any other expert’s testimony. 
Both the Robinson and Gammill analyses 
are appropriate in this context. See generally Guinn v. AstraZeneca Pharm. 
LP, 602 F.3d 1245, 1254 (11th Cir. 2010) (per curiam); Meister v. Med. Eng’g 
Corp., 267 F.3d 1123, 1129 (D.C. Cir. 2001); Westberry v. Gislaved 
Gummi AB, 178 F.3d 257, 263–65 (4th Cir. 1999); 
Heller v. Shaw Indus., Inc., 167 F.3d 146, 153–54 (3d Cir. 1999); 
Moore v. Ashland Chem. Inc., 151 F.3d 269, 275–78 (5th Cir. 1998) (en 
banc).
            
Several of the Robinson factors apply to differential diagnosis as 
a method or technique, as well as its application and the conclusions reached in 
a particular case. “Differential diagnosis is ‘the basic method of internal 
medicine’ and enjoys widespread acceptance in the medical community. Generally 
speaking, when properly conducted the technique has important non-judicial uses, 
is generally accepted as valid by the medical community, and has been subjected 
to use, peer review, and testing.” Coastal Tankships, 87 S.W.3d at 604 (citations omitted). 
While these endorsements of the technique may hold “generally,” we cannot say 
that they will always apply in every case in which a treating physician bases 
his opinion on differential diagnosis. Here, though, Daller’s diagnostic methodology certainly had non-judicial 
uses in that it was used to treat Crump, write prescriptions, and perform 
surgery. Cf. Robinson, 923 S.W.2d at 559 (“[O]pinions formed solely for 
the purpose of testifying are more likely to be biased toward a particular 
result.”). Hunt, Transcontinental’s expert, acknowledged that differential 
diagnosis was used to treat Crump. Although Hunt would have reached different 
conclusions regarding Crump’s infection, he stated that he agreed with the 
treatment methodology Daller employed. See 
Robinson, 923 S.W.2d at 557 (noting that the Robinson reliability 
inquiry focuses “solely on the underlying principles and methodology, not on the 
conclusions they generate”); cf. TXI Transp. Co. v. Hughes, 306 S.W.3d 
230, 235 (Tex. 2010) (“Rather than focus entirely on the reliability of the 
underlying technique used to generate the challenged opinion, as in 
Robinson, we have found it appropriate . . . [to] determine whether there 
are any significant analytical gaps in the expert’s opinion that undermine its 
reliability.”) (citations omitted). Moreover, there is 
no practical way peers could conduct objective, randomized experiments to test 
the validity of Daller’s specific conclusion regarding 
Crump’s injury. Thus, these factors support the reliability of Daller’s expert testimony in this case.
            
Moving to the other Robinson factors, we note that, in some cases, 
a physician’s differential diagnosis may be too dependent upon the physician’s 
subjective guesswork or produce too great a rate of error—for example, when 
there are several consistent, possible causes for a particular set of symptoms. 
Related to these factors, Transcontinental contends that Daller’s diagnostic technique is not reliable because he did 
not exclude the other possible causes of Crump’s death with reasonable medical 
probability. See TXI Transp. Co., 306 S.W.3d at 237 (“An expert’s failure 
to rule out alternative causes of an incident may render his opinion 
unreliable.”); Robinson, 923 S.W.2d at 559 (“An expert who is trying to 
find a cause of something should carefully consider alternative causes. [An 
expert’s] failure to rule out other causes of the damage renders his opinion 
little more than speculation.” (citation omitted)); 
see also Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex. 1995) (“[T]o constitute 
evidence of causation, an expert opinion must rest in reasonable medical 
probability.”). Yet a medical causation expert need not “disprov[e] or discredit[] every 
possible cause other than the one espoused by him.” Viterbo v. Dow Chem. 
Co., 826 F.2d 420, 424 (5th Cir. 1987). Few expert opinions would be 
reliable if the rule were otherwise. Still, if evidence presents “other 
plausible causes of the injury or condition that could be negated, the 
[proponent of the testimony] must offer evidence excluding those causes 
with reasonable certainty.” Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997) (emphases 
added); see also Robinson, 923 S.W.2d at 558–59 (concluding that the 
trial court did not abuse its discretion by excluding testimony by an expert who 
“conducted no testing to exclude other possible causes 
. . . even though he admitted in his deposition that many of 
the symptoms could be caused by” other specific conditions).
            
We conclude that Daller’s testimony adequately 
excluded, with reasonable medical certainty, the other plausible causes raised 
by the evidence. Hunt testified that, in his opinion, Crump died from a 
combination of kidney failure, cirrhosis of the liver, and a fungal infection in 
the lungs exacerbated by preexisting diabetes and a history of immunosuppressant 
drug usage. There is no dispute that these conditions, except the fungal 
infection, all preceded Crump’s May 2000 work-related injury. All of these were 
other plausible causes of Crump’s death. But there was evidence that despite his 
long-term health problems dating from his kidney transplant twenty-five years 
earlier, Crump was generally in good health before his injury at work, and that 
within days after the injury he contracted an infection at the site of the 
injury. Even Hunt acknowledged that Crump’s infection was a “co-morbid 
condition” that made his other health conditions “more difficult to deal with.” 
Hunt disputed any connection between Crump’s injury and the infection, and he 
believed that the injury contributed nothing toward Crump’s death. He concluded 
that Crump would have died on January 23, 2001, regardless of the work-related 
injury of May 2000. But objective evidence of Crump’s good health before his 
injury, his contraction of an infection at the site shortly afterward, and the 
deleterious effect of the infection on his health reasonably ruled out the 
possibility that he died solely from the other conditions he suffered. Based on 
Daller’s experience and training as a transplant 
specialist and surgeon, his dealings with infection-susceptible immunosuppressed patients, and his direct dealings with 
Crump—which included taking cultures directly from the wound site for diagnostic 
purposes—he concluded that Crump’s wound became infected, that the infection 
weakened his organs, and that the natural progression of these events caused his 
death. See Crye, 907 S.W.2d at 500 (“Reasonable 
[medical] probability is determined by the substance and context of the opinion, 
and does not turn on semantics or on the use of a particular term or phrase.”). 
In other words, Daller’s medical causation opinion 
provided a cause that excluded, with reasonable medical certainty, Hunt’s 
suggested causes of death. The evidence was not conclusive, but it was not 
required to be. It was sufficiently reliable to be considered by the jury. Once 
Daller effectively responded to Hunt’s other plausible 
causes of death with reliable testimony, the question was no longer one of legal 
sufficiency, but rather one of competing evidence to be weighed by the jury. 
See Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 40–41 (Tex. 2007).
            
In addition to applying the Robinson factors, Gammill also informs our reliability inquiry. There 
we concluded that the Robinson factors could not be applied to the 
plaintiffs’ experts, “even though mechanical engineering, the expertise claimed 
by the witnesses, is scientific in nature.” Gammill, 972 S.W.2d at 727. 
In that situation, we asked further whether there was “simply too great an 
analytical gap between the data and the opinion proffered.” Id. “The 
‘analytical gap’ between the data . . . and 
[the expert]’s opinion was not shown to be due to his techniques in assessing 
the vehicle restraint system. . . . Rather, the ‘gap’ in [the 
expert]’s analysis was his failure to show how his observations, assuming they 
were valid, supported his conclusions that [the passenger] was wearing her seat 
belt or that it was defective.” Id.
            
The analysis set out in Gammill lends 
support to the reliability of Daller’s expert opinion 
testimony in this case. Daller is board-certified in 
general surgery and critical care, specializes in multiple-organ 
transplantation, and has worked as a clinician in teaching hospitals across the 
country—including the University of Texas Medical Branch at Galveston, where he 
treated Crump. His educational and clinical qualifications to treat 
post-transplantation, immunosuppressed patients, such 
as Crump, are not in dispute. As explained above in addressing the 
Robinson factors, an analytical gap between the data and opinion is not 
shown here because of Daller’s “techniques in 
assessing” Crump. See id. Rather, there must be “failure to show how his 
observations, assuming they were valid, supported his conclusions.” Id. 
He directly treated or oversaw Crump’s treatment on repeated occasions after 
Crump’s work-related knee injury. Daller observed that 
Crump’s wound was located in the same spot as the injury and that the wound site 
became symptomatic as being infected in a predictable time and manner after the 
injury for an immunosuppressed patient such as 
Crump.[3] He observed that, in his words, the wound 
infection tilted Crump’s “seesaw” away from an immunosuppressed patient’s “relative balance” between immunosuppression and infection toward systemic infection. 
He took cultures from the wound site and performed surgery to diagnose and to 
assist healing of the wound. The cultures allowed the observation that Crump’s 
wound was infected with the same agent as the infectious agent that had become 
systemic in Crump. Daller observed that Crump—despite 
being a kidney transplant recipient with diabetes and undiagnosed hepatitis 
C—had no medical history of organ problems from the period after the transplant 
in 1975 until after the work-related injury in 2000. Daller observed the problems with Crump’s organ function and 
concluded that “the worsening of those organs’ functions was caused by the 
infection.”
            
From these observations, Daller concluded:
Q.        
Doctor, do you have an opinion regarding the cause of Mr. Crump’s 
death?
A.        Yes, 
I do.
Q.        And 
what is that opinion, sir?
A.        My 
opinion is that his death resulted from a natural sequence of events that began 
at the time of his knee injury.
Q.        
Doctor, would you please elaborate as to what was the cause of the death 
as it related to the injury?
A.        Mr. 
Crump had had [sic] a renal transplant approximately 25 years prior, I believe. 
He also had what is known as compensated cirrhosis from hepatitis C. At the time 
that he experienced the injury, that injury caused a progression of his hepatic 
insufficiency, and because of his inability to fight off infections and also 
because of his overall medical condition, it caused a series of events that led 
to his death.
Q.        Dr. 
Daller, is it your opinion that the infection which 
Mr. Crump developed was a producing cause of his death?
A.        It 
was the trigger cause of a sequence of events that then occurred.
 
Thus, we 
cannot conclude that there was “too great an analytical gap” between the 
observed data and the proffered opinion. See Gammill, 972 S.W.2d at 727. At 
this point, any “gaps” that remain between the data and the conclusion drawn 
from it go to the weight of Daller’s testimony—not its 
reliability. See Ledesma, 242 
S.W.3d at 40–41.
            
We conclude that Daller’s testimony was based 
on a sufficiently reliable foundation under the standards set out in 
Robinson and Gammill. Because Daller’s expert medical causation testimony is based on a 
reliable foundation, it was admissible at trial as evidence to prove that the 
May 2000 injury was a producing cause of Crump’s death. See Tex. R. Evid. 702. Consequently, on 
legal sufficiency review, we conclude that reasonable jurors could have believed 
his testimony. See City of Keller v. Wilson, 168 S.W.3d 
802, 827 (Tex. 2005). Because Daller’s expert 
testimony was sufficient evidence to support the jury’s verdict on causation, we 
cannot disturb the jury’s finding against Transcontinental on the issue of 
producing cause. Accordingly, Transcontinental’s legal sufficiency challenge is 
denied.
III. Jury Charge
            
In its second issue, Transcontinental argues that the trial court’s 
definition of producing cause is legally incorrect and that, had its proposed 
definition been given, the verdict would not have been in Crump’s favor. 
Transcontinental seeks a new trial. After refusing Transcontinental’s proposed 
definition and overruling its objections that Crump’s definition erroneously 
lacked a but-for component, 
the trial court charged the jury as follows:
 
QUESTION NO. 
1
 
You are 
instructed that the Texas Workers’ Compensation Commission found that Charles 
Crump’s compensable right knee injury of May 9, 2000 resulted in his death on 
January 23, 2001.
 
“Injury” 
means damage or harm to the physical structure of the body and a disease or 
infection naturally resulting from the damage or harm.
 
“Producing 
Cause” means an efficient, exciting, or contributing cause that, in a natural 
sequence, produces the death in question. There may be more than one producing 
cause.
 
WAS 
CHARLES CRUMP’S MAY 9, 2000 INJURY A PRODUCING CAUSE OF HIS 
DEATH?
 
Answer 
“Yes” or “No.”
                                                                                    
Answer: Yes
 
A.        Was 
the Trial Court’s Definition of Producing Cause Erroneous?
            
Transcontinental contends that the trial court gave an erroneous 
definition of producing cause in its jury charge. We agree.
            
“The court shall submit such instructions and definitions as shall be 
proper to enable the jury to render a verdict.” Tex. R. Civ. P. 277. “An instruction is 
proper if it (1) assists the jury, (2) accurately states the law, and (3) finds 
support in the pleadings and evidence.” Union Pac. R.R. Co. v. Williams, 
85 S.W.3d 162, 166 (Tex. 2002) (citing Tex. R. Civ. P. 278). When, as here, 
the content of a trial court’s definition is challenged as legally incorrect, 
our standard of review is de novo. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002).
            
Though the Texas Workers’ Compensation Act does not use the phrase 
“producing cause,”[4] this has been the standard for proving 
causation in workers’ compensation claims for more than eighty years.[5] Courts generally agreed that the workers’ 
compensation causation standard was not to be as exacting as that of the common 
law, but no uniform definition of causation in the workers’ compensation context 
emerged.[6] As the law developed, courts recognized 
that the only substantial difference between the two standards was that a 
proximate cause—the common law standard—must be foreseeable.[7] We finally approved a definition of 
producing cause for workers’ compensation cases in 1943:
 
Compensation is awarded to the legal beneficiary of the deceased 
employee if death results from the injury. Causal connection must be established 
between the injury and the death. The injury must be the producing cause of the 
death, and producing cause has been defined as that cause which, in a natural 
and continuous sequence, produces the death 
. . . in issue, and without which the death . . . 
would not have occurred.
 
Jones v. Traders & Gen. Ins. Co., 169 S.W.2d 160, 162 
(Tex. 1943) (citation and quotation omitted). We have not addressed the 
matter since then.
            
In a recent products liability case, however, we held that what had been 
“a frequently submitted definition of ‘producing cause’ should no longer be 
used.” Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 35 (Tex. 2007). The trial 
court in that case had given the products liability pattern jury charge 
definition: “‘Producing cause’ means an efficient, exciting, or contributing 
cause that, in a natural sequence, produces the incident in question. There may 
be more than one producing cause.” Id. at 45.[8] Because we held that the trial court 
committed reversible error in a separate part of the charge, we reversed on that 
ground and remanded the case for new trial. Id. at 
44. But to assist the parties and the court on remand, we further held 
that producing cause should be correctly defined as “a substantial factor in 
bringing about an injury, and without which the injury would not have occurred.” 
Id. at 46.
            
The definition submitted by Crump and accepted at trial—“‘Producing 
Cause’ means an efficient, exciting, or contributing cause that, in a natural 
sequence, produces the death in question. There may be more than one producing 
cause.”—is the same as the pattern jury charge definition we rejected in Ledesma, substituting only “death” for “incident.” 
Transcontinental urges us now to adopt for workers’ compensation cases the same 
definition we approved in Ledesma for products 
liability cases. Crump asserts that the Ledesma 
definition of producing cause has no place in workers’ compensation law. Because 
we have not addressed the “substantial factor” terminology from products 
liability law in the context of workers’ compensation cases, we must decide 
whether our holding in Ledesma applies here.[9]
            
In considering whether to apply Ledesma’s definition, we first examine the causation 
standards for proximate cause and producing cause. “The two elements of 
proximate cause are cause in fact (or substantial factor) and foreseeability. . . . Cause in fact is established 
when the act or omission was a substantial factor in bringing about the 
injuries, and without it, the harm would not have occurred.” IHS Cedars Treatment Ctr. v. Mason, 
143 S.W.3d 794, 798–99 (Tex. 2004). “The approved definition 
of ‘proximate cause’ in negligence cases and the approved definition of 
‘producing cause’ in compensation cases are in substance the same, except that 
there is added to the definition of proximate cause the element of foreseeableness.” Staggs, 134 
S.W.2d at 1028–29. In other words, the producing cause inquiry is 
conceptually identical to that of cause in fact. We have recognized this in 
Deceptive Trade Practices Act cases. See, e.g., Prudential Ins. Co. of 
Am. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 161 (Tex. 1995) (“For DTPA 
violations, only producing cause must be shown. The element common to both 
proximate cause and producing cause is actual causation in fact. This requires 
proof that an act or omission was a substantial factor in bringing about injury 
which would not otherwise have occurred.”) (citations 
omitted). Also, in Ledesma, a products 
liability case, we recognized that producing cause and cause in fact are 
conceptually identical. See 242 S.W.3d at 46 (“Defining producing cause 
as being a substantial factor in bringing about an injury, and without which the 
injury would not have occurred, is easily understood and conveys the essential 
components of producing cause that (1) the cause must be a substantial cause of 
the event in issue and (2) it must be a but-for cause, 
namely one without which the event would not have occurred.”).[10] The producing 
cause inquiry in workers’ compensation cases is conceptually no different from 
the cause in fact inquiry in negligence cases and the producing cause inquiry in 
other substantive contexts. We see no reason to define producing cause differently in this context.[11] Therefore, we hold that producing cause 
in workers’ compensation cases is defined as a substantial factor in bringing 
about an injury or death, and without which the injury or death would not have 
occurred.
            
Having concluded that Ledesma applies to 
this case, we must determine whether the definition given here was erroneous. 
The definition of producing cause given by the trial court in this case is, in 
all relevant respects, the same as the pattern jury charge definition we 
rejected in Ledesma. See 242 S.W.3d at 45. Transcontinental cites Ledesma for the proposition that the use of the 
“efficient, exciting, or contributing cause” language is erroneous. We disagree. 
In Ledesma, we reasoned that those terms had no 
practical meaning to modern jurors in products liability cases. Id. at 46. We held that the use of those terms 
provides “little concrete guidance” to modern jurors, and a definition that 
omits either the substantial factor or but-for 
components “is incomplete.” Id. But we did not go so far as to say that 
employing the terms “efficient, exciting, or contributing cause” in a producing 
cause definition was, as Transcontinental suggests, erroneous. Thus, while the 
concerns about terminology “foreign to modern English” and incomplete 
definitions expressed in Ledesma apply equally 
to this case, the mere use of these terms is not, in itself, error.[12]
            
Crump argues that the “substantial factor” component of the Ledesma definition imposes a higher causation burden 
upon workers’ compensation claimants than what exists at present. We disagree. 
We have always required in workers’ compensation cases a showing of “unbroken 
causal connection” between the compensable injury and the claimant’s injury or 
death. Staggs, 134 S.W.2d at 1030; see Jones, 169 S.W.2d at 162; 
Burnett, 105 S.W.2d at 202. Although, as the dissent points out, our 
earlier cases did not address the “substantial factor” terminology, there is 
nothing in those opinions to suggest that cause in fact should not be part of 
the causal connection analysis. See Jones, 169 S.W.2d at 162; 
Staggs, 134 S.W.2d at 1030; Burnett, 105 
S.W.2d at 202. In fact, we cannot conceive of causal connection analysis without 
consideration of cause in fact. The substantial factor language serves only to 
illustrate an essential aspect of causation to jurors, as we have noted:
 
The word 
“substantial” is used to denote the fact that the defendant’s conduct has such 
an effect in producing the harm as to lead reasonable men to regard it as a 
cause, using that word in the popular sense, in which there always lurks the 
idea of responsibility, rather than in the so-called “philosophic sense,” which 
includes every one of the great number of events without which any happening 
would not have occurred. Each of these events is a cause in the so-called 
“philosophic sense,” yet the effect of many of them is so insignificant that no 
ordinary mind would think of them as causes.
Lear 
Siegler, Inc. v. Perez, 819 S.W.2d 470, 472 & n.1 (Tex. 1991) (quoting 
Restatement (Second) of Torts § 
431 cmt. a (1965)); see also Borg-Warner 
Corp. v. Flores, 232 S.W.3d 765, 770 (Tex. 2007). In other words, for an act 
or event to rise to the level of cause in the legal sense, the act or event must 
be such that reasonable jurors would identify it as being actually responsible 
for the ultimate harm. The cause must be more than one of the countless 
ubiquitous and insignificant causes that in some remote sense may have 
contributed to a given effect as, for example, simply getting up in the morning. 
That the term substantial factor is given to this commonsense aspect of legal 
causation simply makes plain to jurors that more than causation in this 
indirect, “philosophic sense” is required. See Staggs, 134 S.W.2d at 1030 
(recognizing that but-for language repeated something already included in the 
usual and ordinary meaning of “cause” and draws juror attention to the 
importance of an unbroken causal connection). It does not demand, nor even 
imply, a higher standard of legal causation beyond the ordinary sense of the 
concept.
            
Transcontinental argues that the omission of but-for language in the 
charge submitted by the trial court renders the definition legally incorrect. We 
agree. As we discussed in one workers’ compensation case, “to say of a cause of 
an injury that it is one ‘but for which the injury would not have happened’ is 
to repeat something already included in the usual and ordinary meaning of the 
word ‘cause.’” Id. (quoting Tex. & Pac. Ry. Co. v. Short, 62 
S.W.2d 995, 999 (Tex. Civ. App.—Eastland 1933, writ ref’d)). However, the inclusion of but-for language in 
producing cause definitions has long been considered useful, serving “to direct 
the jury’s attention to the importance of unbroken causal connection between the 
injury and the disability or death.” Id.; see also Wichita 
County v. Hart, 917 S.W.2d 779, 783–84 (Tex. 1996) (“A trial court must 
submit explanatory instructions and definitions that will assist the jury in 
rendering a verdict.”). We recognized this in Ledesma and, desiring to offer “practical help to a 
jury striving to make the often difficult causation determination,” held that a 
producing cause definition that did not include the 
but-for component was “incomplete.” 242 S.W.3d at 
46. Indeed, we have often referred to producing cause and cause in fact 
synonymously with but-for causation. See, e.g., LMB, 
Ltd. v. Moreno, 201 S.W.3d 686, 688 (Tex. 2006) (per curiam); Marathon Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003) (per curiam); Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 
661, 667 (Tex. 1999). The producing cause definition submitted in this 
case lacked the but-for component. It, too, was 
incomplete, and therefore an erroneous statement of the law of producing cause. 
See Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166 
(Tex. 2002).
B.        Was 
the Trial Court’s Definition of Producing Cause Harmful?
            
Having decided that the trial court’s definition of producing cause was 
erroneous, we now consider whether this error requires reversal. 
Transcontinental asserts that the trial court’s omission of the but-for component of the producing cause definition was 
reversible error. We agree.
            
“A judgment will not be reversed for charge error unless the error was 
harmful because it probably caused the rendition of an improper verdict . . . .” Columbia Rio Grande 
Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009) (citing Tex. R. App. P. 61.1). “Charge error is 
generally considered harmful if it relates to a contested, critical issue.” 
Id. (citing Bel-Ton Elec. Serv., Inc. 
v. Pickle, 915 S.W.2d 480, 481 (Tex. 1996) (per curiam), and Sw. Bell Tel. Co. v. John Carlo Tex., 
Inc., 843 S.W.2d 470, 472 (Tex. 1992)). “To determine whether the 
instruction probably caused an improper judgment, we examine the entire record.” 
Quantum Chem. Corp. v. Toennies, 47 S.W.3d 473, 480 (Tex. 2001).
            
Daller, one of Crump’s treating physicians and 
Crump’s sole expert, testified:
 
Mr. Crump 
had had [sic] a renal transplant approximately 25 years prior, I believe. He 
also had what is known as compensated cirrhosis from hepatitis C. At the time 
that he experienced the injury, that injury caused a progression of his hepatic 
insufficiency, and because of his inability to fight off infections and also 
because of his overall medical condition, it caused a series of events that led 
to his death.
 
According to 
Daller, the site of the injury became infected, the 
infection caused Crump’s already-weakened organs to fail, and his organ failure 
in turn caused his death. Further, on cross-examination he testified:
 
Q:        It’s 
your opinion that the cause of the infection was histoplasmosis but that but for the bruise the histoplasmosis would not have developed into a full-stage 
infection, right?
A:        That 
is correct.
 
On the other 
hand, Transcontinental’s expert, Hunt, testified that Crump died from the 
natural complications of being immunosuppressed for 
twenty-five years rather than from the May 9, 2000 injury:
Q.        In 
your opinion, would the death have occurred without the May 9, 2000 injury ever 
taking place?
A.        
Yes.
 
Hunt testified 
on cross-examination, “Had [Crump] not had that contusion to his knee, he still 
would have had those other problems.”
 
Q.        So, 
you’re saying that Mr. Crump would have been in there in Polly Ryon [Memorial Hospital] on January 23rd of 2001, dying of 
liver failure, kidney failure, aspiration of the stomach, his heart was giving 
out—I mean, his whole body was shutting down. You said 
yourself he was critically ill.
A:        Yes, 
sir.
 
Transcontinental bore the burden of proving, by a preponderance 
of the evidence, the negative proposition that the May 2000 injury was not a 
producing cause of Crump’s death. See Tex. Lab. Code § 410.303; Morales 
v. Liberty Mut. Ins. 
Co., 241 S.W.3d 514, 516 (Tex. 2007) (“[T]he appealing party bears the 
burden of proof by a preponderance of the evidence. The factfinder may consider, but is not bound by, the appeals 
panel’s decision. The method of review that [the Labor Code] provides is known 
as modified de novo review.”) (citations omitted). 
The but-for aspect of causation was squarely at issue 
in this case, and the sole question before the jury was whether the May 2000 
injury was a producing cause of Crump’s death. Here, the charge error “relate[d] 
to a contested, critical issue”—indeed, the sole issue—that of causation. See 
Hawley, 284 S.W.3d at 856; see also Toennies, 47 S.W.3d at 480 (“An improper instruction is 
especially likely to cause an unfair trial when the trial is contested and the 
evidence sharply conflicting, as it was in the present case [when the trial 
court gave an incorrect causation standard].”); Tex. Dep’t of Human Servs. v. Hinds, 904 S.W.2d 629, 637 (Tex. 1995) 
(finding harmful error where a jury instruction stated the standard of causation 
incorrectly and the evidence was “vigorously and convincingly disputed”); 
John Carlo Tex., Inc., 843 S.W.2d at 472 (“Virtually the entire factual 
dispute between the parties has been over whether Bell’s conduct was justified. 
To ask the jury to resolve this dispute without a proper legal definition [of 
justification,] the essential legal issue[,] was 
reversible error.”). Including the but-for component in 
the definition would have assisted the jury in resolving the disputed expert 
testimony at the crux of the case and, more importantly, would have stated the 
law accurately. See Williams, 85 S.W.3d at 166. 
In these circumstances, the absence of a proper definition of producing cause 
probably resulted in an improper judgment and, as such, was reversible error. 
See Hinds, 904 S.W.2d at 637.
            
Prior to trial, Transcontinental objected to Crump’s definition, the one ultimately accepted by the trial 
court, asserting it was not a correct statement under Texas law. 
Transcontinental tendered its own definition in writing, including a but-for component: “that cause, 
which in a natural and continuous sequence, produces death and without which, 
the death would not have occurred.” See Tex. R. Civ. P. 278 (“Failure to submit 
a definition or instruction shall not be deemed a ground for reversal of the 
judgment unless a substantially correct definition or instruction has been 
requested in writing and tendered by the party complaining of the judgment.”). 
Because Transcontinental’s definition included the critical but-for component, 
and was otherwise a correct statement of law, it was “substantially correct” and 
sufficed to preserve its complaint of charge error on appeal. See Hinds, 
904 S.W.2d at 637–38 (“There should be but one test for determining if a party 
has preserved error in the jury charge, and that is whether the party made the 
trial court aware of the complaint, timely and plainly, and obtained a ruling.”) 
(quoting State Dep’t of Highways v. Payne, 838 
S.W.2d 235, 241 (Tex. 1992)).
            
We hold that the definition of producing cause approved in Ledesma—a substantial factor in bringing about the 
injury or death and without which the injury or death would not have 
occurred—applies in workers’ compensation cases. Because the definition 
submitted here lacked the but-for component, and 
because its omission in this case constitutes harmful error, we remand the case 
for new trial.
IV. Attorney’s Fees
            
Transcontinental first argues that the trial court erred in denying it a 
jury trial on the amount of Crump’s reasonable and necessary attorney’s fees for 
which Transcontinental was statutorily liable, and second, in permitting Crump 
to recover attorney’s fees incurred in pursuing those statutory attorney’s fees. 
We address the first issue—whether a judge or jury decides attorney’s fees under 
Texas Labor Code § 408.221(c)—to provide guidance for parties and trial courts. 
We leave the second question—whether fees can be awarded in the pursuit of fees— 
for another day.
            
Relying on this Court’s precedent and the language of § 408.221, 
Transcontinental argues that the trial court erred when it refused to grant a 
jury trial and, instead, decided the disputed amount of Crump’s attorney’s fees 
for which Transcontinental was liable under § 408.221(c). Crump contends that 
the statute’s plain language alone provides that the court, and not a jury, is 
to determine the amount of reasonable and necessary attorney’s fees for which 
Transcontinental is liable. The court of appeals favored Crump’s plain language 
argument and held that the trial court did not err in denying Transcontinental’s 
request to submit the issue to a jury. 274 S.W.3d at 
103. We hold that when a question of fact exists on the reasonableness 
and necessity of a claimant’s attorney’s fees under § 408.221(c), the carrier 
has a right to submit that question to a jury.
            
In construing another provision of the Workers’ Compensation Act, we set 
out the scope of our inquiry:
 
The 
meaning of a statute is a legal question, which we review de novo to ascertain 
and give effect to the Legislature’s intent. Where text is clear, text is 
determinative of that intent. This general rule applies unless enforcing the 
plain language of the statute as written would produce absurd results. 
Therefore, our practice when construing a statute is to recognize that the words 
the Legislature chooses should be the surest guide to legislative intent. Only 
when those words are ambiguous do we resort to rules of construction or 
extrinsic aids.
 
Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 437 
(Tex. 2009) (citations, internal quotations, and italics omitted). We 
review de novo the trial court’s denial of Transcontinental’s request for a jury 
trial under subsection (c). See id.
            
We look first to the language of the statute.[13] The relevant 
portions of § 408.221 read:
 
(a)        An 
attorney’s fee, including a contingency fee, for representing a claimant before 
the division or court under [the Texas Workers’ Compensation Act] must be 
approved by the commissioner or court.
(b)        
Except as otherwise provided, an attorney’s fee under this section is 
based on the attorney’s time and expenses according to written evidence 
presented to the division or court. Except as provided by Subsection (c) . . . , the attorney’s fee shall be paid 
from the claimant’s recovery.
(c)        An 
insurance carrier that seeks judicial review 
. . . of a final decision of the appeals panel regarding 
compensability or eligibility for, or the amount of, income or death benefits is 
liable for reasonable and necessary attorney’s fees as provided by Subsection 
(d) incurred by the claimant as a result of the insurance carrier’s appeal if 
the claimant prevails on an issue on which judicial review is sought by the 
insurance carrier . . . . If the carrier appeals multiple issues and 
the claimant prevails on some, but not all, of the issues appealed, the court 
shall apportion and award fees to the claimant’s attorney only for the issues on 
which the claimant prevails. In making that apportionment, the court shall 
consider the factors prescribed by Subsection (d). . . .
(d)       In 
approving an attorney’s fee under this section, the commissioner or court shall 
consider:
(1)        the time and labor required;
(2)        the novelty and difficulty of the questions involved;
(3)        the skill required to perform the legal services 
properly;
(4)        the fee customarily charged in the locality for similar legal 
services;
(5)        the amount involved in the controversy;
(6)        the benefits to the claimant that the attorney is responsible 
for securing; and
(7)        the experience and ability of the attorney performing the 
services.
            
. . . .
(i)         
Except as provided by Subsection (c) 
. . . , an attorney’s fee may not exceed 25 percent of the 
claimant’s recovery.
 
Tex. Lab. Code 
§ 408.221. We review the plain language of the statute 
as written to decide whether Crump’s or Transcontinental’s interpretation—judge 
or jury—is supported.
            
According to Crump, subsection (c)’s instruction that the court is to 
award apportioned fees means that the court alone determines the reasonable and 
necessary amount of fees—according to criteria given in subsection (d). This 
interpretation, Crump argues, comports with subsection (b)’s general rule that 
attorney’s fees under § 408.221 are based on written evidence of time and 
expenses presented to the court, which would have no use for this 
information if it were not deciding the amount to award. Crump correctly notes 
that § 408.221 makes no mention of a jury.
            
Transcontinental focuses on the first words in subsection (b): “Except as 
otherwise provided.” Id. § 408.221(b). It argues 
that subsection (c) represents an exception to the general rule set out in 
subsections (a) and (b), where a claimant’s attorney’s fees are paid out of the 
claimant’s benefit recovery and a court decides those fees. Subsection (c) 
controls the situation where a claimant’s attorney’s fees are paid directly by 
the liable insurance carrier, and a court—or, according to Transcontinental, a 
jury if one is sought—decides the extent of the carrier’s additional liability 
beyond the claimant’s benefits award. Transcontinental points out that every 
reference to a court’s action in § 408.221 is that of approval, except in 
sentence two of subsection (c), under which the court is to apportion and, after 
that apportionment is concluded, “award fees to the claimant’s attorney only for 
the issues on which the claimant prevails.” Id. § 
408.221(c). Transcontinental correctly observes that the statute does not 
state explicitly that the court alone is to determine the amount of attorney’s 
fees, nor does it expressly forbid a jury from deciding the matter.
            
The statute is silent on the critical judge-or-jury question. Both 
parties offer legitimate, reasonable interpretations of § 408.221 and subsection 
(c)’s role within it. Because both interpretations are reasonable as to their 
applicability here, we conclude that the statute is ambiguous. See In 
re Mo. Pac. R.R. Co., 998 S.W.2d 212, 217 (Tex. 1999) (“Beyond these 
preliminary observations, the statute is not entirely clear in all its 
particulars. The language of the statute could support more than one reasonable 
interpretation and therefore is ambiguous. Because it is ambiguous, we may turn 
to extratextual sources. . . .”). 
Because the plain language of the statute alone is unavailing, we look beyond 
it. See id.; see also Tex. 
Gov’t Code § 311.023 (“In construing a statute, 
. . . a court may consider among other matters the 
. . . common law or former statutory provisions, including laws on the 
same or similar subjects . . . .”). Specifically, we are guided 
by prior decisions examining the issue of reasonable and necessary attorney’s 
fees in the context of fee-shifting provisions in other statutory regimes and by 
the history of how § 408.221 has evolved over the years.
            
Section 408.221 provides two relevant possibilities in which an insurance 
carrier will pay a claimant’s attorney’s fees.[14] The first is 
where the carrier pays the claimant’s attorney’s fees for representation before 
the Division of Workers’ Compensation[15] and some court proceedings, but the fees 
are subtracted from the claimant’s recovery. Tex. Lab. Code § 408.221(a)–(b). 
Because, in effect, the claimant pays in this situation, the claimant’s 
attorney’s fees are limited to 25% of the claimant’s recovery. Id. § 408.221(I). The trial court must approve 
these fees, id. § 408.221(a), and must consider several factors in 
doing so, id. § 408.221(d). The insurance 
carrier can only be said to pay these fees in the technical sense that it drafts 
a separate check for the attorney’s fees, payable directly to the claimant’s 
attorney. Id. § 408.221(h). In reviewing 
fees awarded in this situation, we have “held that the amount of the attorney’s 
fees to be allowed in compensation cases is a matter for the trial court to 
determine without the aid of a jury, and the amount of the recovery is within 
its discretion.” Tex. Employers Ins. Ass’n v. 
Motley, 491 S.W.2d 395, 397 (Tex. 1973) (citing Tex. Employers Ins. Ass’n v. Hatton, 255 S.W.2d 848, 849 (Tex. 1953) (“The 
amount of attorney’s fees to be allowed in a compensation case is exclusively 
for the court and not the jury, and any such [contingency-fee] contract was made 
subject to the approval by the court. The court in his discretion could award a 
lesser amount.”)). Crump cites Motley and Hatton as dispositive 
here. But, as discussed below, those cases do not address subsection (c), which 
was not enacted until decades later.
            
The second possibility is at issue in this case. Here, the insurance 
carrier pays the claimant’s “reasonable and necessary attorney’s fees” for 
representing the claimant on judicial review in the courts when the carrier is 
unsuccessful on an issue it appealed from the Division of Workers’ Compensation. 
Tex. Lab. Code § 408.221(c). These fees 
are not subtracted from the claimant’s recovery, but are paid by the carrier on 
top of the claimant’s benefits award. See id. § 408.221(b)–(c). In 
this situation, the claimant’s attorney’s fees are not limited to 25% of the 
claimant’s recovery, but only by reasonableness and necessity. See id. 
§ 408.221©, (I). This fee-shifting provision in § 408.221 did not exist 
until 2001.[16] Prior to 2001, the only attorney’s fee 
award mechanism was the one in subsection (b), described in the paragraph above, 
where the claimant always pays his own attorney’s fees regardless of the outcome 
of the carrier’s appeal.[17] For this reason, Motley and 
Hatton do not control in this case—they addressed this other statutory 
scheme, and could not have contemplated the fee-shifting mechanism presented in 
subsection (c). While we have not 
previously examined the fee-shifting provision in subsection (c), we have 
discussed similar fee-shifting provisions in other cases. “In general, the 
reasonableness of statutory attorney’s fees is a jury question.” City of Garland v. Dallas Morning News, 22 S.W.3d 351, 367 
(Tex. 2000). In City of Garland, we considered the fees available 
to a substantially prevailing party under the Texas Public Information Act. 
Id. at 367–68. The Act provided:
 
(a)        In an 
action brought under Section 552.321 [suit for writ of mandamus under the 
Act] . . . , the court may assess costs 
of litigation and reasonable attorney fees incurred by a plaintiff or defendant 
who substantially prevails.
 
(b)        In 
exercising its discretion under this section, the court shall consider whether 
the conduct of the governmental body had a reasonable basis in law and whether 
the litigation was brought in good faith.
 
Id. at 367 (quoting the former version of Tex. Gov’t Code § 552.323). We reasoned that, 
from the plain language of the statute, “the trial judge decides whether to 
award attorney’s fees under the Act.” Id. (emphasis added). But we 
immediately noted that “section 552.323 does not dictate how to determine the 
attorney’s fees amount, except that the award must be ‘reasonable.’ In 
general, the reasonableness of statutory attorney’s fees is a jury question.” 
Id. (emphasis added, citation omitted).
            
As support for this “general” proposition, we cited Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 
1998), which involved attorney’s fee awards under the Declaratory Judgment Act. 
Id. In any proceeding under the Act, “the court may award costs and 
reasonable and necessary attorney’s fees as are equitable and just.” Bocquet, 972 S.W.2d at 20 (quoting Tex. Civ. Prac. & Rem. 
Code § 37.009). We 
had to determine whether a judge or jury was to decide the amount of fees in 
order to answer another question: “[B]y what standard is such an award of 
attorney fees to be reviewed on appeal”? Id. Because the Act read “may,” 
the trial court had discretion to decide whether to award fees at all. 
Id. We recognized that the Act limited this discretion in four ways: 
reasonableness, necessity, equity, and justice. Id. at 
21. Each of those terms prescribed whether a judge or jury was to decide 
them. Id. Generally, reasonableness was a fact question for the jury’s 
determination, as was necessity. Id. On the other hand, equity was within 
the trial court’s discretion, as was justice. Id. Our examination of the 
Act’s language led us to conclude:
 
Therefore, 
in reviewing an attorney fee award under the Act, the court of appeals must 
determine whether the trial court abused its discretion by awarding fees when 
there was [legally or factually] insufficient evidence that the fees were 
reasonable and necessary, or when the award was inequitable or unjust. 
Unreasonable fees cannot be awarded, even if the court believed them just, but 
the court may conclude that it is not equitable or just to award even reasonable 
and necessary fees. This multi-faceted review involving both evidentiary and 
discretionary matters is required by the language of the Act.
 
Id. In 
concluding that reasonableness and necessity of attorney’s fees were matters of 
fact committed to a jury, we also noted that there are “factors prescribed by 
law which guide the determination of whether attorney fees are reasonable and 
necessary.” Id. (citing Arthur Andersen & Co. v. Perry Equip. 
Corp., 945 S.W.2d 812, 818 (Tex. 1997) (listing factors “a factfinder should consider when determining the 
reasonableness of a fee”)).
            
The principles established for construing statutory fee-shifting 
provisions in City of Garland and Bocquet assist the interpretation of § 408.221(c) of 
the Texas Labor Code. Crump has not pointed us to a reason to exempt § 408.221 
from the general rule announced in those cases: “[T]he reasonableness of 
statutory attorney’s fees is a jury question.” City of Garland, 22 S.W.3d at 367. Nor do we see language in § 408.221 that 
distinguishes it from the language of the statutory regimes to which we applied 
the general rule in those cases. Applying that general rule here, we conclude 
that the carrier is entitled to submit the issue of the reasonableness and 
necessity of a claimant’s attorney’s fees, where disputed, to a jury, which will 
consider subsection (d)’s factors. See Tex. Lab. Code § 408.221(c), 
(d). The next step depends on whether the claimant totally 
or partially prevails on the issues appealed by the insurance carrier. If the 
claimant prevails only on some issues, then after the jury’s verdict is 
announced the court will apportion the fees per the factors in subsection (d), 
and will award reasonable and necessary attorney’s fees to the claimant’s 
attorney only for those issues on which the claimant prevails. See Tex. Lab. Code § 408.221(c). If the 
claimant totally prevails, the jury’s verdict as to the fee amount for which the 
carrier is liable is then subject only to the court’s approval based on the 
factors in subsection (d). Id. § 408.221(a), (d); see also Bocquet, 972 S.W.2d at 21 (“Unreasonable fees cannot be 
awarded . . . .”). Regardless of whether the 
claimant partially or totally prevails, the jury’s verdict as to the fee amount 
“must be approved by the . . . court.” Tex. Lab. Code § 408.221(a). When a 
claimant pays his attorney’s fees out of his benefits recovery, the amount 
approved by the court is solely within its discretion based on the attorney’s 
time and expenses according to written evidence presented to the court and 
according to subsection (d)’s factors. See id. § 408.221(a), (b), 
(d); Hatton, 255 S.W.2d at 849. This 
interpretation resolves § 408.221’s ambiguity while respecting its pre- and 
post-2001 award mechanisms and, at the same time, respects our precedent on the 
reasonableness and necessity of statutory attorney’s fees.
            
Thus, we hold that an insurance carrier is entitled to have a jury 
determine the disputed amount of reasonable and necessary attorney’s fees for 
which it is liable under § 408.221(c).
V. Conclusion
            
We hold that: (1) the treating physician’s opinion is based on a reliable 
foundation and, therefore, legally sufficient evidence supports the jury’s 
verdict; (2) the trial court’s omission of the but-for component in the jury 
charge constitutes reversible error; and (3) an insurance carrier is entitled to 
have a jury determine the disputed amount of reasonable and necessary attorney’s 
fees for which it is liable. We reverse the court of appeals’ judgment and 
remand the case to the trial court for new trial.
 
                                                                                                
___________________________
                                                                                                
Paul W. Green
                                                                                                
Justice
 
OPINION DELIVERED: August 27, 
2010
                                                            








[1] 
For simplicity, we refer to the Crumps collectively in this 
opinion.

[2] 
In Robinson, we outlined six useful 
considerations for determining the reliability of expert testimony:
1.             
the extent to which the theory has been or can 
be tested;
2.             
the extent to which the technique relies upon 
the subjective interpretation of the expert;
3.             
whether the theory has been subjected to peer 
review and/or publication;
4.             
the technique’s potential rate of 
error;
5.             
whether the underlying theory or technique has 
been generally accepted as valid by the relevant scientific community; 
and
6.             
the non-judicial uses which have been made of 
the theory or technique.
923 S.W.2d at 557. “We emphasized in Robinson that these factors 
are non-exclusive and that [Texas] Rule [of Evidence] 702 contemplates a 
flexible inquiry.” Cooper Tire & Rubber Co. v. 
Mendez, 204 S.W.3d 797, 801 (Tex. 2006).

[3] 
“[T]emporal proximity 
alone does not meet standards of scientific reliability and does not, by itself, 
support an inference of medical causation. . . . Nevertheless, when 
combined with other causation evidence, evidence that conditions exhibited 
themselves or were diagnosed shortly after an event may be probative in 
determining causation.” Guevara v. Ferrer, 247 S.W.3d 662, 667–68 (Tex. 2007) (citations 
omitted).

[4] 
See 
Tex. Lab. 
Code § 408.181(a) (“An insurance carrier shall pay death benefits to 
the legal beneficiary if a compensable injury to the employee results in 
death.”) (emphasis added); id. 
§ 401.011(10) (“‘Compensable injury’ means an injury that arises out 
of and in the course and scope of employment for which compensation is 
payable under this subtitle.”) (emphasis added); 
id. § 401.011(26) (“‘Injury’ means damage or harm to the physical 
structure of the body and a disease or infection naturally resulting from 
the damage or harm.”) (emphasis 
added).

[5] 
Initially the phrase “exciting and efficient 
cause” was used to describe the causation element in a workers’ compensation 
claim. See, e.g., Travelers’ Ins. Co. v. Smith, 266 S.W. 574, 
575–76 (Tex. Civ. App.—Beaumont 1924, no writ) (“[T]he act contemplates 
. . . that in case of the death of the employee from a disease which 
is shown to be the exciting and efficient cause of the employee’s death, his 
beneficiaries are entitled to compensation, though they be unable to prove that 
such death was proximately caused by the injury received, as the term ‘proximate 
cause’ is used in the law of negligence.”). “Producing cause” was used 
interchangeably with “efficient cause.” Travelers’ Ins. Co. v. Peters, 14 
S.W.2d 1007, 1008 (Tex. Comm’n App. 1929, holding 
approved), vacated on other grounds, 17 S.W.2d 457 (Tex. Comm’n App. 1929). Peters held:
[T]he rule of proximate cause has no application to 
cases arising under the Workmen’s Compensation Act. The term “proximate cause” 
is not used anywhere in the act. A party claiming compensation under such act 
cannot be compelled to go further than is required by the provisions of the act, 
either in pleading or proving his cause of action. It is true that there must be 
established a causal connection between an injury and the death of an employee 
before a recovery would be authorized. If, however, the injury is shown to be 
the producing cause of the death, a finding is justified that death was due to 
the injury, if it arises in the course of and out of the employment.
Id.

[6] 
E.g., Tex. Employers’ Ins. Ass’n v. Burnett, 105 S.W.2d 200, 202 (Tex. 1937) 
(“Confusion has arisen by the use of the term ‘producing cause’ as distinguished 
from the term ‘proximate cause’ usually employed in negligence 
cases.”).

[7] See, e.g., 
Tex. Indem. Ins. Co. v. Staggs, 134 S.W.2d 1026, 1028–29 
(Tex. 1940). In Staggs, we explained:
It is well settled that in a suit under the compensation 
law it is not necessary for the claimant to show that the injury proximately 
caused disability or death. Recovery is authorized if a causal connection is 
established between the injury and the disability or death. “Producing cause” is 
the term most frequently used in compensation cases. Sometimes the cause 
required to be proven is described as an “efficient, exciting or contributing 
cause.” The approved definition of “proximate cause” in negligence cases and the 
approved definition of “producing cause” in compensation cases are in substance 
the same, except that there is added to the definition of proximate cause the 
element of foreseeableness. It is apparent that 
“producing cause” is broader in its scope than is “proximate 
cause.”
Id. (citations 
omitted).

[8] 
See also Comm. on 
Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—Malpractice, 
Premises, & Products 70.1 (2002).

[9] 
Our Ledesma 
opinion was issued just after the court of appeals received briefing, but the 
court of appeals held it “distinguishable and inapplicable to this appeal 
because it is a products liability case which requires the cause to be a 
substantial factor of the event in issue, a requirement absent from a workers’ 
compensation case.” 274 S.W.3d at 100 
n.13.

[10] Ledesma 
did not distinguish between DTPA and products liability cases when surveying the 
various definitions of producing cause. See 242 S.W.3d at 45–46 
n.47.

[11] We observe 
that the substantial factor terminology, though infrequently encountered, is not 
entirely foreign to workers’ compensation law. See, 
e.g., Pac. Indem. Co. v. Arline, 213 S.W.2d 691, 698 (Tex. Civ. App.—Beaumont 1948, 
writ dism’d by agr.) (“[T]he Workmen’s Compensation Law 
expresses the necessary causal relation between injury and disability by various 
forms of the word ‘result’ in almost every instance 
. . . . The words ‘resulting from’ 
. . . refer only to causation in fact; the requirement is that 
the injury be a substantial factor in bringing about the disability, something 
without which the disability, would not have occurred. . . . [E]very 
definition . . . we have seen of ‘producing 
cause,’ a term which has been frequently used, expresses only causation in 
fact.”).

[12] Consistent 
with Ledesma, however, we believe those terms 
ought not to be used to define producing cause in the 
future.

[13] Subsection 
(c) is the focus of the parties’ dispute, but because it is part of a single 
section of the Labor Code governing the award of attorney’s fees, we construe it 
in that context. See Morales, 241 S.W.3d at 517 (“We 
. . . consider each provision in the context of the entire 
statute, not merely those portions that are in dispute.”); Cont’l Cas. Ins. Co. v. 
Functional Restoration Assocs., 19 S.W.3d 393, 398 (Tex. 2000) (“Each 
provision must be construed in the context of the entire statute of which it is 
a part.”); Bridgestone/Firestone, Inc. v. Glyn-Jones, 878 S.W.2d 132, 133 
(Tex. 1994) (“Only in the context of the remainder of the statute can the true 
meaning of a single provision be made clear.”).

[14] Attorney’s 
fees resulting from appeals of an award of supplemental income benefits are also 
addressed in § 408.221, and are not under consideration here. See 
Tex. Lab. Code 
§ 408.221(b), (c), (i); see also 
id. § 408.147(c) (mandating payment of employee’s attorney’s fees if 
a carrier unsuccessfully disputes a supplemental income benefits 
award).

[15] Fee awards 
for representing a claimant before the Division of Workers’ Compensation—not at 
issue here—are set forth in the Texas Administrative Code. See 28 Tex. Admin. Code § 152.1.

[16] See Act of May 
25, 2001, 77th Leg., R.S., ch. 1456, § 8.01, 2001 
Tex. Gen. Laws 5167, 5189 (codified at Tex. Lab. Code § 408.221).
 

[17] See 
generally Act of Dec. 13, 1989, 71st 
Leg., 2d C.S., ch. 1, § 4.09, 1989 Tex. Gen. Laws 
1, 34–35 (embodying what is now codified in § 408.221 as it existed prior to the 
2001 amendment adding subsection (c)).